Howard Ross Cabot, Bar #006669
Christopher S. Coleman, Bar #018287
Jacob C. Robertson, Bar #024763
PERKINS COIE BROWN & BAIN P.A.
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788
Telephone: 602.351.8000
Facsimile: 602.648.7000
HCabot@perkinscoie.com
CColeman@perkinscoie.com
JRobertson@perkinscoie.com

*Attorneys for Defendants*
  *The Vanguard Group, Inc. and*
  *Vanguard Marketing Corporation*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Barbara Borchers, as Trustee and as attorney in fact and, and Jerald S. Chesler, as a Trustee of the Olson Living Trust,<br><br>        Plaintiffs,<br><br>  v.<br><br>The Vanguard Group, Inc. and Vanguard Marketing Corporation,<br><br>        Defendants. | No. CV08-02138-PHX-ROS<br><br>**VANGUARD'S SEPARATE STATEMENT OF MATERIAL UNDISPUTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

Pursuant to Local Rule LRCiv 56.1(a), The Vanguard Group, Inc. and Vanguard Marketing Corporation (collectively, "Vanguard") hereby submit the following Separate Statement of Material Undisputed Facts in Support of its Motion for Summary Judgment.

**STATEMENT OF UNDISPUTED MATERIAL FACTS**

1.   In April 2008, Betty Olson, in the presence of Barbara Borchers and estate attorney David Estes, authorized Vanguard to liquidate the funds remaining in the Olson

1  Living Trust Account and send Ms. Olson a check with the proceeds. [Declaration of
2  Counsel in Support of Vanguard's Motion for Summary Judgment ("Counsel Decl."), Ex.
3  1 (Borchers Dep.) at 116:13 – 25]

4      2.  Barbara Borchers testified that the full and expected amount of the
5  redemption arrived at her mother's residence, and there is nothing in connection with the
6  April 2008 liquidation of funds that was fraudulent or otherwise inappropriate. [Counsel
7  Decl., Ex. 1 (Borchers Dep.) at 116:13 – 118:10]

8      3.  As part of its regular business operations, Vanguard prepares a periodic
9  statement (at least quarterly) for each account. For accounts with check writing
10 privileges, the statements identify each check by number, including the date and amount,
11 that is paid on that account. [Affidavit of Joseph P. Parlapiano in Support of Vanguard's
12 Motion for Summary Judgment ("Parlapiano Aff.") ¶ 4]

13     4.  The statements are mailed to the address of record designated by the
14 account holder shortly after the end of the statement period. In the event that a statement
15 is returned as undeliverable, Vanguard contacts the client or freezes the account if the
16 client is not reached. [Parlapiano Aff. ¶¶ 5-6]

17     5.  Between 2005 and 2009, Vanguard mailed periodic account statements to
18 the address of record for the Olson Living Trust Account within five days of the end of
19 each reporting period, which is monthly or quarterly depending on the account activity.
20 [Parlapiano Aff. ¶¶ 5, 7-8]

21     6.  Vanguard's records show no returned mail in connection with the Olson
22 Trust Account between 2005 and 2009. [Parlapiano Aff. ¶ 10]

23     7.  Plaintiffs produced copies of "Third Party Copy" account statements
24 delivered to "Barbara Borchers, 8913 North 80th Place, Scottsdale AZ 85258," ranging in
25 date from July 31, 2007 (at B-0062) to May 31, 2008 (at B-0080). [Counsel Decl., Ex. 3
26 (excerpts from Exhibit No. 3 to Deposition of Barbara Borchers); *see also id.*, Ex. 6

1 (Plaintiffs' Supplemental Answers to Interrogatories)]

2     8.    Ms. Borchers testified in deposition that she received copies of the account 3 statements beginning around July 2007 at her mother's request and does not recall a time 4 when she did not receive statements from that time forward.  [Counsel Decl., Ex. 1 5 (Borchers Dep.) at 92:22 – 93:2 ("Q. . . . But from the time that letter was sent in July of 6 2007 requesting duplicate account statements be sent to your Scottsdale address, was 7 there ever any time that you can recall that you did not receive the account statements? 8 A.  No, no.")]

9     9.    The account statements Vanguard mailed in connection with the Olson 10 Living Trust Account, identified the check number, amount, and date of payment of each 11 check paid on the account.  [Parlapiano Aff. ¶¶ 4, 9; Counsel Decl., Ex. 1, (Borchers 12 Dep.) 86:13 – 87:7 ("Q.  And if you look on Page 4 of that July account statement, which 13 is B-0065, do you see that page?  A. Sure, yes.  Q.  And if you look at the date in the left-14 hand column, what was your understanding of that date?  A.  1-05.  Q.  Of the date 15 column, generally?  A.  That those were dates in '06, the checks were written.  Q.  And if 16 you look at the transaction where it says check writing, you understood that to be a check 17 transaction; correct?  A.  Right.  Q.  And the number next to the check writing, you 18 understood that to be the check number; correct?  A.  Yes.  Q.  And one column over, 19 looking at the dollar amount, you understood that to be the dollar amount of the check; 20 correct?  A.  Yes."]

21     10.    Vanguard has no record of any *specific* checks reported by Ms. Olson as 22 bearing an unauthorized signature.  [Counsel Decl., Ex. 2 (Matysik Dep.) at 21:10-17 23 ("Q.  Did those documents [Statement of Forgery] that you just described in that answer 24 that Vanguard sends out to clients, did Vanguard send those to Betty Olson?  A.  No.  Q. 25 Why not?  A.  Because she never made a direct allegation that specific checks were being 26 forged by her son, to my knowledge."), 25:7 – 16 ("Q.  Did any Vanguard person in the

-3-

1   20 to 25 phone calls that you listened to, did any Vanguard person say to Betty Olson or
2   any other Olson family member, what checks or check numbers are you talking about so
3   we can complete the form for you?  A.  Not to my knowledge.  Q.  Why didn't they do
4   that?  A.  Because during the conversations that I listened to, there's never a conversation
5   with our client where that allegation [allegation of a specific forged or altered check] is
6   made on the telephone."); 37:14-38:19 (although client's daughter who was not
7   authorized on the account sent a note requesting generally that payments be stopped,
8   Vanguard never got specific information of forged or altered checks); 49:23-51:14 (. . .
9   "Betty Olson does not at any point in time make any allegation on her calls that there's
10  fraudulent checks being presented on her account. . . ."); 52:13 – 55:1 (stating Vanguard
11  never received allegation from client as to whether checks were forged)]

12      11.     Neither Ms. Olson nor Ms. Borchers has ever provided Vanguard with an
13  affidavit of forgery in accordance with Vanguard's procedure or sought reimbursement
14  for specific checks. [Counsel Decl., Ex. 1 (Borchers Dep.) at 41:17 – 42:16 (Ms. Olson
15  did not want to report her son for check fraud because she did not want him to risk going
16  to jail); 52:24-53:5 ("Q.  During your three meetings with Vanguard, did you ever ask
17  Vanguard to reimburse the amounts that had been written or any amounts that had been
18  written on checks to the account?  A.  No.  Q.  Did your mother?  A.  No."); 67:13 – 16
19  ("Q.  Did you ever hear your mother ask Vanguard to reimburse amounts that were
20  written on checks from Vanguard accounts?  A.  No.");  93:3 – 11 ("Q. During your --
21  between March 2008 and your visit in July 2007, when your mother was living in Las
22  Cruces, did you ever request that Vanguard reimburse specific amounts on your mother's
23  account?  A.  Did I ever request it?  No.  Q.  Do you have any knowledge of whether your
24  mother requested it?  A.  I never heard her request it, but I wasn't always present in the
25  room."); 118:11 – 119:6 ("Q.  And during April 2008 -- prior to receiving the check at
26  your house in April 2008, do you recall a telephone conversation with Vanguard

-4-

representatives in which you requested that Vanguard reimburse specific amounts of funds to your mother's account due to fraudulent checks? A. I don't recall specifically, but I do remember discussing the vast amounts that were missing, and how we would retrieve these. Q. And what specifically did you ask? A. I said how did one go about retrieving all this missing money. Q. And what were you told? A. I was told my mother and I would have to take legal action. Q. And what was your response to that? A. Thank you. Q. Did you fill out an affidavit of forgery. A. No. I told Mr. Estes. Q. Did you do anything other than that? A. No. No, I didn't."); Ex. 2 (Matysik Dep. 53:13 – 54:7 (client never provided affidavit because specific checks were never reported)]

Dated: October 29, 2010

**PERKINS COIE BROWN & BAIN P.A.**

By:/s/ Jacob C. Robertson
    Howard Ross Cabot
    Christopher S. Coleman
    Jacob C. Robertson
    2901 North Central Avenue, Suite 2000
    Phoenix, Arizona  85012-2788

*Attorneys for Defendants*
 *The Vanguard Group, Inc. and*
 *Vanguard Marketing Corporation*

**CERTIFICATE OF SERVICE**

☒    I hereby certify that on October 29, 2010, I electronically transmitted the attached documents to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

> Philip J. Nathanson [*philipj@nathanlawfirm.com*]
> The Nathanson Law Firm
> 8765 East Bell Road, Suite 110
> Scottsdale, Arizona  85260
> *Counsel for Plaintiffs*

☒    I hereby certify that on October 29, 2010, I served the attached document by first class mail on Judge Silver, United States District Court of Arizona, 401 West Washington Street, Phoenix, Arizona 85003-2118.

s/ Indy Fitzgerald

LEGAL19011777.1