1   Philip J. Nathanson    Arizona State Bar #013624
    THE NATHANSON LAW FIRM
2   8765 E. Bell Rd. – Suite 101
    Scottsdale, AZ  85260
3   (480) 419-2578
4   (480) 419-4136
        *Attorney for Plaintiffs*
5

6                   UNITED STATES DISTRICT COURT
                         DISTRICT OF ARIZONA
7

8   Barbara Borchers and Jerald S. Chesler, as          No. CV08-02138-PHX-ROS
    Trustee of the Betty D. Olson Revocable
9   Trust and The Olson Living Trust,
                                                         **PLAINTIFFS' RESPONSE IN
10                    Plaintiffs,                        OPPOSITION TO THE
                                                         DEFENDANTS' MOTION FOR
11         v.                                            SUMMARY JUDGMENT.**

12  The Vanguard Group, Inc. and Vanguard
    Marketing Corporation,
13
                      Defendants.
14

15        Plaintiffs, BARBARA BORCHERS and JERALD S. CHESLER, as Trustee of the Betty

16  D. Olson Revocable Trust and The Olson Living Trust, submit this Separate Statement of Facts

17  ("SSOF") in Support of their Response to the Motion for Summary Judgment filed by

18  Defendants,   THE   VANGUARD   GROUP,   INC.   and   VANGUARD   MARKETING

19  CORPORATION (hereinafter "Vanguard"):

20

21             **PLAINTIFF – BARBARA BORCHERS DEPOSITION**

22       1. Plaintiff, BARBARA BORCHERS, was the daughter of the decedent, BETTY

23  OLSON (Ex. #1, pp. 10-17).

24       2. Her mother discussed the condo mortgage with her.  She also had the statements

25

26  from Vanguard come to the 80th Place address so she could watch them and Barb could be

1
2
3
4
5
6

privy to them.  When the statements came to the house they noticed large amounts were

bring withdrawn.  Her mother was good at figures and she always kept track of stuff like

that.  She wanted to know where the money was going.  When it became larger and larger

amounts withdrawn, Barb called Vanguard and made an appointment with Shelly Wilson,

her representative (Ex. #1, pp. 37-38).

7
8
9

     3.   Barb thinks they saw Shelly in June of 2005 (Ex. #1, p. 38).

     4.   They talked to Shelly about some discrepancies in the invoices and not being

10
11
12
13
14

able to recognize some checks.  Shelly suggested they come in for a meeting.  The

meeting was within a week.  They brought the invoices and asked Shelly to check on the

discrepancies.  Shelly left the room and came back with Xeroxed copies with 4 checks and

asked her mother if they were her signature (Ex. #1, p. 39).

15
16
17
18
19

     5.   Shelly came back with those 4 specific checks and asked for them to validate

the signatures.  Her mother responded that it was not her signature.  Shelly asked if she

knew who's signatures they were and her mother responded that they were Michaels (Ex.

#1, p. 40).

20
21
22
23
24
25

     6.   Shelly told her mother that it was fraudulent or a felony because he was not

authorized to sign the checks.  Her mother said that she was in Arizona and that he is in

Las Cruces and that she doesn't have all of her checks.  Her mother left the checks in a

safe in their garage.  Her mother said it was Michael because he was the only one that had

access to her Vanguard checks (Ex. #1, p. 41).

26

     7.   Shelly said they will red flag the account and that means that the signatures will

be double or triple checked and every check that comes through will be looked at and scrutinized for her mother's signature.  Her mother said that was good (Ex. #1, p. 42).

8.  Shelly said she'd keep in touch with them and for her mother to do the same if she noticed anything illegal happen (Ex. #1, p. 43).

9.  After the meeting her other continued to receive the statements.  Within six weeks of the meeting they noticed discrepancies again.  They called Shelly Wilson.  They tried to get a hold of Shelly.  They set up a meeting in August (Ex. #1, p. 44).

10. Barb was in the room for the meeting.  They were told that Shelly was no longer on the account.  A man told them he didn't know much about the account.  He would be getting a new rep for the account.  He sat down and her mother explained the situation to him.  She told him that things were happening with the account that was happening before.  The Vanguard rep told them that he was not aware of the case or what was happening.  Her mother said that the account was supposed to be red flagged so it wouldn't happen again.  He asked who she thought was accessing the account.  Her mother said her son (Ex. #1, p. 45-46).

11.  Her mother told Michael that he wasn't authorized to write and sign her signatures and to never do it again.  The conversation was 10 minutes (Ex. #1, p. 47).

12. Barb got 2 copies of what Shelly Wilson showed her.  She never showed

anyone the document other than her mother (Ex. #1, pp. 47-48).

13. The second meeting was very short.  Her mother did not point out the discrepancies on the statements.  The Vanguard Rep left the meeting saying that he was sorry Shelly wasn't there and that she was no longer on the case.  They'll be notified of their new rep and he has no knowledge of the case.  They never heard any follow-up from Vanguard after that meeting.  They called Vanguard again about a week later to find out the name of the new rep.  (Ex. #1, pp. 48-49).

14. Barb does not recall the name of the woman who took over for Shelly.  They met the woman briefly in the Vanguard lobby.   Her mother explained the situation and the woman said she would get up to speed to make sure that the checks were red-flagged (Ex. #1, p. 50).

15. Only the first four checks were discussed during the meeting.  Her mother said that she saw the signatures and they were not hers.  The rep said that she would look at all of Shelly's files and documents and get back to her mother.  (Ex. #1, p. 51)

Exhibit 1-Document of the first 4 checks, number and amount.

16. Barb doesn't know when she got this document.  She doesn't think Shelly gave it to her.  Possible a trustee. (Ex. #1, P. 56)

17. Her mother instructed the trustee to call Shelly.  Barb was not always in the

-5-

room when her mother talked to the trustee.  Barb and the trustee had power of attorney.  She doesn't recognize the handwriting, but the initials are hers. (Ex. #1, P. 57)

18. The document reflects a stop payment on those checks.  But Barb does not have any independent recollection of what it is.  She wasn't privy to stop payments.  (Ex. #1, P. 58).

19. Her mother did make calls to Vanguard.  If she called them and talked to someone it was the only way she could keep in touch with somebody.  (Ex. #1, P. 70)

20. Barb recalls maybe 4 calls to Vanguard.  She recalls her mother asking for number amounts and writing them down on a piece of paper and putting them in her wallet, purse, etc. (Ex. #1, P. 71)

21. Exhibit 2 – A letter Barb wrote when she was power of attorney and had access to the Vanguard account with her mother on the phone.  (Ex. #1, P. 72)


22. Her mother requested that the monthly statements be sent to Barbara D. Borchers.  Barb wrote it out and her mother signed it.  Barb was okay with getting the statements.  Her mother was distressed about what was going on with her accounts and she wanted Barb to get them at the house on 80th place because she thought she was going to stay there and that was going to be her permanent residence.  That was actually changed to her permanent residence by her trustee until she decided to go back.  (Ex. #1, P. 74)

23. She lived there and wanted Barb to go over them with her.  She must have found a lot of discrepancies and wanted the statements to go to Barb.  Barb saw her sign the letter.  The second page was not sent to Vanguard.  It is Barb's handwriting.  (Ex. #1, P. 75)

1

2

3

4

5      24. Exhibit 3-B-0071 It's the amount of money in one of her accounts that

6  considerable decreased from the end of December of '06-'07.   Barb recognized the

7  account statement from Vanguard.   B-0062 address in upper left hand corner; Barb's

8
   address.  (Ex. #1, PP. 81-84)
9

10     25. Barb happened to have it because her mother had it sent to her.  She received

11  the statement right after the trip she made to NM.  (Ex. #1, PP. 85-86)

12     26. When she received these statements she'd try to call her mother, but she had

13
   limited phone use.  She did call Vanguard and tried to talk to representatives, but she kept
14
15  getting a different rep.  (Ex. #1, P. 87)

16     27. In July-August 2007 Barb called Vanguard about the figures going down

17  except for the QQQ.  (Ex. #1, P. 88)

18
       28. Barb would call about concerns.  Sometimes her mother wasn't with her.  So,
19
20  they'd send her forms to send letters.  To fill out the forms and send the FedEx.  March

21  2008-she did not save all the forms sent in, but she saved the receipts.  (Ex. #1, P. 89)

22
       29. Barb called Vanguard about a dozen times about the statements and withdraws.
23
   She said at one point they turned it over to the fraud department.  They called it a case
24
25  instead of an account.  (Ex. #1, P. 90)

26     30. Barb doesn't recall what the Vanguard rep said, but felt protected because

every call was recorded for the client and Vanguard's best interest.  So she felt protected in that way.  She remembers the rep being switched a lot.  She'd have to start all over again with each rep. until she got someone in the fraud department.  (Ex. #1, P. 91)

31. Heidi Stram and Richard Ansheim were the people she talked to a lot.  He was the last person she ever talked to at Vanguard and he was one of the first people she ever spoke to so his name stuck.  (Ex. #1, P. 92)

32. Feb/March 2008 when she was in Las Cruces with her mother she called Vanguard.  She had to handle things for her mother because she was ill.  (Ex. #1, PP. 95-96)

33. She came back to Scottsdale with her mother mid March 2008.  Exhibit 4-hand written note to Vanguard, "please stop check withdrawals unless verified by Betty Olson.  Barbara Borchers, send new checks to (Scottsdale address); old checks being withheld by my son Michael."  (Ex. #1, PP. 97-98).

1

2

3
34. She had to fill out forms and send them to the fraud department.  There was no

4
longer an account.  It had become a case, a fraudulent case. .  (Ex. #1, P. 100)

5
35. She had to deal with the fraud department to stop calling the regular number.

6
The forms were long and involved and wanted explanations.  She just filled out whatever

7
they asked for. .  (Ex. #1, P. 101)

8

9
36. Exhibit 5-Handwritten letter B0096-0099; Making Barb the agent for her

10
Vanguard account.  She talked to Prader and Hewitt. .  (Ex. #1, P. 101)

11
It is a handwritten document from Barb to Vanguard stating the situation the Vanguard

12
trustee certification documents that they requested from her.

13

14
37. She sent it around March 24, 2008.  To change the password and the PIN

15
number, permanently cancel anything going to Las Cruces and send everything to

16
Scottsdale.  It mentioned her mother's doctor and condition and that Mike had all of her

17
old checks and she had none.  They requested new checks.  Mike wrote six checks at that

18

19
time and her mother put a freeze on the account on the 13th of March. .  (Ex. #1, P. 102)

20
38. Barb signed the letter for her mother.  The documents sent were trustee

21
certification documents to make Barb the trustee for Vanguard account.  Until that point

22
Barb was not on her Vanguard account to handle her money. .  (Ex. #1, P. 103)

23

24
39. Barb sent the papers in so she could make some decisions, get some checks and

25
speak with people without having to put her on the phone.  She successfully completed the

26
paperwork to become trustee. .  (Ex. #1, P. 104)

40. In April they told her that she had everything and they sent the new checks. They also told her she had to send in forms to release the QQQ money which was the only money her mom had left and that took a few weeks and they released it to her. . (Ex. #1, P. 105)

41. Barb got a letter from Vanguard thanking them for operating on the computer account. She knew something was wrong because her mother didn't know how to operate the computer for the account. . (Ex. #1, P. 9107)

42. A letter was addressed to Brandt Olson 2 or 3 years after he was deceased talking to him about his accounts and everything. Barb directly sent a copy of his death certificate to Vanguard. . (Ex. #1, P. 107)

43. She was baffled how someone could withdraw large portions of money from an account that was flagged. He mother told her it was $130,000. . (Ex. #1, P. 109)

44. Barb was on the phone when her mother froze the account so Mike could not write any more checks. She told them she wanted all of her old checks destroyed or they said they would put a freeze on them and that there were 6 checks written. She told them not to cash them. Barb doesn't know if they cashed them. Her mother was not able to write or access the funds during the time she wanted to freeze the account. . (Ex. #1, P. 111).

**<u>Vanguard 30(b)(6) Deponent - William Matysik</u>**

45. The 30(b)(6) deponent designated by Vanguard was William Matysik, a senior fraud investigator (Ex. #2, p. 4).

46. There were 20 to 25 phone calls between Betty Olson, her daughter, Barbara Borchers and Vanguard representatives (Ex. #2, p. 10-11)

47. Vanguard asked its customers to fill out its Statement of Forgery, which specifically identifies by CWR number exactly the check, the amount, the payee, what fund it came from, and that she did not receive any direct benefit from the check. Each check required a separate Vanguard Statement of Forgery pursuant to Vanguard's policies and procedures (Ex. #2, p. 16, 18-20).

48. Vanguard did not send the required documents, such as the Statement of Forgery, to Betty Olson, and the Vanguard representative did not know if she was asked to identify forged checks (Ex. #2, pp. 21-22).

49. It was Vanguard's policy and procedure to complete the Statement of Forgery identifying the specific checks that were forged (Ex. #2, pp. 22-23).

50. Vanguard's policy was that if a client calls in then Vanguard is going to ask them to identify by check number which checks they are speaking about.. The fraud team then completes the Statement of Forgery listing the checks (Ex. #2, pp. 24-25).

51. According to the Vanguard representative, there was no allegation made that checks were being written that were not authorized by the client, Betty Olson, which allegation triggers the Statement of Forgery procedure (Ex. #2, pp. 25-26).

52. One document did have the amounts of checks that was sent to Vanguard (Ex. #2, pp. 31-32).

53. Vanguard had a doctor's note that Betty Olson had dementia when there were competing claims made by her daughter and son (Ex. #2, pp. 33-34).

54. The Vanguard representative deponent claimed that no specific check information came from Betty Olson, that it came from Barbara Borchers, her daughter, and that she did not have proper paperwork (Ex. #2, pp. 36-37).

55. The representative deponent did not know if forged checks were reported (Ex. #2, pp. 38-39).

56. Shelly Wilson of Vanguard met with Betty Olson in 2005 at Vanguard's Scottsdale office (Ex. #2, p. 39).

57. Vanguard is not a bank.  It is an investment company in the mutual fund business (Ex. #2, pp. 16-17).

58. The accounts were mutual fund accounts, investment accounts (Ex. #2, pp. 58-59).

**SHELLY WILSON DEPOSITION**

59. Shelly Wilson was and is a customer service representative in Scottsdale (Ex. #3, pp. 5-6).

60. In 2005 Betty Olson and Barbara Borchers alerted her, as a Vanguard employee, that they were afraid of someone writing checks, signing the checks.  Betty Olson told Shelly Wilson that her daughter Barbara Borchers was authorized to deal with

1    the check writing issue (Ex. #3, pp. 9-11).

2        61. Barbara and Betty Olson told Shelly Wilson that there were checks that Betty

3    Olson had not signed.   Wilson followed Vanguard policy and notified the fraud

4

5    department that the client alleged there were checks she was not signing (Ex. #3, pp. 12,

6    16, 18, 28).

7        62. Barbara and Betty also came in to see Shelly Wilson at the Vanguard office.

8    Shelly does not remember whether she showed Barbara forged checks (Ex. #3, pp. 13).

9

10       63. Wilson said it was apparent that the checks in question did not have Betty

11   Olson's signature on them because the signatures did not match when compared against

12   Betty's signature card on the computer (Ex. #3, pp. 21-22, 30-31).

13       64. Vanguard is an investment company, not a bank (Ex. #3, pp. 24).

14

15       65. Vanguard has its own check processing unit (Ex. #3, pp. 25-26).

16

17

18

19

20

21

22

23

24

25

26

1   Dated:  December 16, 2010

2

3                                                          **THE NATHANSON LAW FIRM**

4                                                          By:/s/  Philip J. Nathanson

5
                                                           Philip J. Nathanson
6                                                          8765 East Bell Road, Suite 101
                                                           Scottsdale, Arizona 85260
7
                                                           *Attorneys for Plaintiffs Barbara Borchers and*
8                                                          *Jerald S. Chesler, as Trustee of the Betty D.*
                                                           *Olson Revocable Trust and The Olson Living*
9                                                          *Trust*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**CERTIFICATE OF SERVICE**

⊠       I hereby certify that on December 16, 2010, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Howard Ross Cabot, Bar #006669
Christopher S. Coleman, Bar #018287
Jacob C. Robertson, Bar #024763
PERKINS COIE BROWN & BAIN P.A.
2901 North Central Avenue, Suite 2000
Phoenix, AZ 85012-2788

                                        s/ Philip J. Nathanson